## IN THE UNITED STATES DISTRICT COURT
## FOR THE SOUTHERN DISTRICT OF WEST VIRGINIA

### BECKLEY DIVISION

| | |
|---|---|
| ALLEN L. LEGG, | ) |
| | ) |
| Plaintiff, | ) |
| | ) |
| v. | )     CIVIL ACTION NO. 5:08-00013 |
| | ) |
| MICHAEL J. ASTRUE, | ) |
| Commissioner of Social Security, | ) |
| | ) |
| Defendant. | ) |

### M E M O R A N D U M   O P I N I O N

This is an action seeking review of the decision of the Commissioner of Social Security denying Plaintiff's application for Disability Insurance Benefits (DIB) and Supplemental Security Income (SSI), under Titles II and XVI of the Social Security Act, 42 U.S.C. §§ 40 - 433, 1381-1383f. This case presently is pending before the Court on the parties' cross-Motions for Judgment on the Pleadings. (Document Nos. 19 and 23.) Both parties have consented in writing to a decision by the United States Magistrate Judge. (Document Nos. 4 and 5.)

The Plaintiff, Allen L. Legg (hereinafter referred to as "Claimant"), filed an application for DIB and SSI on July 7, 2006 (protective filing date), alleging disability as of March 8, 2003,[1] due to degenerative disc disease, cervical spinal stenosis, and herniated discs in his back.[2] (Tr. at 130-37,

---

[1] By letter dated July 6, 2007, Claimant amended his alleged onset date from March 8, 2003, to December 3, 2005. (Tr. at 8, 575.)

[2] On April 8, 2004, Claimant filed prior applications for DIB and SSI, alleging disability as of March 8, 2003. (Tr. at 8, 78.) The claims were denied initially and on reconsideration. (Tr. at 90-92, 96-98.) On September 27, 2004, Claimant requested a hearing before an Administrative Law Judge ("ALJ"). (Tr. at 78.) The hearing was held on August 1, 2005, before the Honorable Brian P. Kilbane. (Tr. at 56-70.) By decision dated December 2, 2005, the ALJ determined that Claimant was not entitled to benefits. (Tr. at 78-85.) Claimant did not appeal the ALJ's decision. (Tr. at 26.)

139, 148.) The claim was denied initially and on reconsideration. (Tr. at 104-06, 107-09.) On February 5, 2007, Claimant requested a hearing before an Administrative Law Judge (ALJ). (Tr. at 110.) The hearing was held on November 8, 2005, before the Honorable R. Neely Owen. (Tr. at 22-55.) By decision dated October 25, 2007, the ALJ determined that Claimant was not entitled to benefits. (Tr. at 8-21.)[3] The ALJ's decision became the final decision of the Commissioner on November 30, 2007, when the Appeals Council denied Claimant's request for review. (Tr. at 2-4.) On January 7, 2008, Claimant brought the present action seeking judicial review of the administrative decision pursuant to 42 U.S.C. § 405(g). (Document No. 2.)

Under 42 U.S.C. § 423(d)(5), a claimant for disability has the burden of proving a disability. See Blalock v. Richardson, 483 F.2d 773, 774 (4th Cir. 1972). A disability is defined as the "inability to engage in any substantial gainful activity by reason of any medically determinable impairment which can be expected to last for a continuous period of not less than 12 months . . . ." 42 U.S.C. § 423(d)(1)(A).

The Social Security Regulations establish a "sequential evaluation" for the adjudication of disability claims. 20 C.F.R. §§ 404.1520, 416.920 (2007). If an individual is found "not disabled" at any step, further inquiry is unnecessary. Id. §§ 404.1520(a), 416.920(a). The first inquiry under the sequence is whether a claimant is currently engaged in substantial gainful employment. Id. §§ 404.1520(b), 416.920(b). If the claimant is not, the second inquiry is whether claimant suffers from a severe impairment. Id. §§ 404.1520(c), 416.920(c). If a severe impairment is present, the third

---

[3] The undersigned notes that pages two, three, and eleven of the ALJ's decision were omitted from the corrected transcript filed on May 2, 2008 (Document No. 15.), but were included in the original transcript filed on March 7, 2008. (Document No. 11.) Consequently, references herein to the ALJ's decision are to the decision contained in the original transcript.

inquiry is whether such impairment meets or equals any of the impairments listed in Appendix 1 to Subpart P of the Administrative Regulations No. 4. Id. §§ 404.1520(d), 416.920(d). If it does, the claimant is found disabled and awarded benefits. Id. If it does not, the fourth inquiry is whether the claimant's impairments prevent the performance of past relevant work. 20 C.F.R. §§ 404.1520(e), 416.920(e). By satisfying inquiry four, the claimant establishes a prima facie case of disability. Hall v. Harris, 658 F.2d 260, 264 (4th Cir. 1981). The burden then shifts to the Commissioner, McLain v. Schweiker, 715 F.2d 866, 868-69 (4th Cir. 1983), and leads to the fifth and final inquiry: whether the claimant is able to perform other forms of substantial gainful activity, considering claimant's remaining physical and mental capacities and claimant's age, education and prior work experience. 20 C.F.R. §§ 404.1520(f), 416.920(f) (2007). The Commissioner must show two things: (1) that the claimant, considering claimant's age, education, work experience, skills and physical shortcomings, has the capacity to perform an alternative job, and (2) that this specific job exists in the national economy. McLamore v. Weinberger, 538 F.2d 572, 574 (4th Cir. 1976).

In this particular case, the ALJ determined that Claimant satisfied the first inquiry because he had not engaged in substantial gainful activity since the amended alleged onset date, December 3, 2005. (Tr. at 15, Finding No. 2.) Under the second inquiry, the ALJ found that Claimant suffered from spinal disc disorder and sprains/strains of all types, which were severe impairments. (Tr. at 15, Finding No. 3.) At the third inquiry, the ALJ concluded that Claimant's impairments did not meet or equal the level of severity of any listing in Appendix 1. (Tr. at 22, Finding No. 4.) The ALJ then found that Claimant had a residual functional capacity for work at the light level of exertion, requiring as follows:

> [L]ifting up to twenty pounds occasionally and ten pounds frequently, standing
> and/or walking up to six hours in an eight-hour workday, sitting up to six hours in

3

an eight hour workday, performing limited pushing and/or pulling including operation of hand and/or foot controls due to left arm weakness due to impingement, occasionally climbing ramps/stairs, stooping, kneeling, crouching, and crawling, but never climbing ladders/ropes/scaffolds or balancing, is limited in reaching in all directions including overhead and feeling but unlimited in handling (gross manipulation) and fingering (fine manipulation), had no visual or communicative limitations but should avoid concentrated exposure to extreme cold, vibrations, and avoid even moderate exposure to working in hazardous conditions including moving machinery and at heights. This conclusion is consistent with the medical report of medical expert for Disability Determination Services in October 2006 (Exhibit B-16F) and in December 2006 (Exhibit B-22F).

(Tr. at 23, Finding No. 5.) At step four, the ALJ found that Claimant could not return to his past relevant work. (Tr. at 27, Finding No. 6.) On the basis of testimony of a Vocational Expert ("VE") taken at the administrative hearing, the ALJ concluded that Claimant could perform jobs such as a ticket taker, an order filler, and a flagger, at the light level of exertion. (Tr. at 27-28, Finding No. 10.) On this basis, benefits were denied. (Tr. at 29, Finding No. 11.)

Scope of Review

The sole issue before this Court is whether the final decision of the Commissioner denying the claim is supported by substantial evidence. In Blalock v. Richardson, substantial evidence was defined as:

evidence which a reasoning mind would accept as sufficient to support a particular conclusion. It consists of more than a mere scintilla of evidence but may be somewhat less than a preponderance. If there is evidence to justify a refusal to direct a verdict were the case before a jury, then there is 'substantial evidence.'

Blalock v. Richardson, 483 F.2d 773, 776 (4th Cir. 1972) (quoting Laws v. Celebrezze, 368 F.2d 640, 642 (4th Cir. 1966)). Additionally, the Commissioner, not the Court, is charged with resolving conflicts in the evidence. Hays v. Sullivan, 907 F.2d 1453, 1456 (4th Cir. 1990). Nevertheless, the Courts "must not abdicate their traditional functions; they cannot escape their duty to scrutinize the record as a whole to determine whether the conclusions reached are rational." Oppenheim v. Finch,

4

495 F.2d 396, 397 (4th Cir. 1974).

A careful review of the record reveals the decision of the Commissioner is not supported by substantial evidence.

Claimant's Background

Claimant was born on August 6, 1964, and was 42 years old at the time of the administrative hearing, July 5, 2007. (Tr. at 19, 29-30, 130.) Claimant has a tenth grade, or limited, education. (Tr. at 19, 29-30, 146.) In the past, he worked as an iron worker, welder, forklift operator, concrete worker, timber cutter, and ranch laborer. (Tr. at 19, 30-35, 50-51, 140-41.)

 The Medical Record

The Court has reviewed all the evidence of record, including the medical evidence, and will discuss it below in relation to Claimant's arguments.

Claimant's Challenges to the Commissioner's Decision

Claimant alleges that the Commissioner's decision is not supported by substantial evidence because the ALJ erred in not giving great weight to the opinion and residual functional capacity ("RFC") assessment of Claimant's treating physician, Dr. John Collins, M.D., without any explanation as to why he failed to give greater weight to Dr. Collins's opinion. (Document No. 20 at 2, 7-10.) Specifically, Claimant alleges that in violation of 20 C.F.R. §§ 404.1527(d)(2)-(6) and 416.927(d)(2)-(6), the ALJ failed to mention

> the length of the treatment relationships, the extent of the treatment or specialization of the doctors providing opinions on functional capacity and no explanation as to why he found Doctor Collins' opinion as stated in the medical assessment form not consistent with his own statements on the assessment form and not supported by the claimant's treatment records at Doctor Collins' office and not supported by the credible evidence of record. The Administrative Law Judge fails to even mention Doctor Collins' medical assessment form in his written decision.

5

(Id. at 9.) Claimant contends, therefore, that he was left to speculate as to the ALJ's reasoning. (Id.) Furthermore, Claimant alleges that the ALJ improperly cited Claimant's credibility and earnings record and work ethic as grounds for questioning Dr. Collins's opinion. (Id. at 9-10.)

The Commissioner contends that Claimant's "cervical neck condition caused some functional limitations, but did not preclude all work." (Document No. 23 at 9-10.) Consequently, Dr. Collins's opinion that Claimant was disabled, was not entitled to great weight. (Id. at 11.) Although Dr. Collins's opinion was based on a herniated disc in Claimant's neck, his opinion was "not well-explained in light of [Claimant's] benign clinical findings and his unusual clinical presentations. Moreover, his disability opinion is contrary to the state agency physician consultants, who opined that [Claimant] could perform light work." (Id. at 12.) Furthermore, Dr. Collins's opinion is inconsistent with the opinions of chief neurosurgeon Dr. Jane and consultative examiner Dr. Maducdoc, who opined that neither was surgery warranted, nor that Claimant was disabled. (Id.) Contrary to Claimant's allegations, the ALJ properly considered Claimant's credibility regarding his limitations and subjective symptoms but found that his testimony was not credible in its entirety for legally sufficient reasons. (Id.) Accordingly, the Commissioner asserts that the ALJ's decision is supported by substantial evidence and that Claimant's arguments are without merit. (Id. at 15.) Analysis.

At steps four and five of the sequential analysis, the ALJ must determine the claimant's residual functional capacity for substantial gainful activity. "RFC represents the most that an individual can do despite his or her limitations or restrictions." See Social Security Ruling 96-8p, 61 Fed. Reg. 34474, 34476 (1996). Pursuant to SSR 96-8p, the RFC assessment "must be based on all of the relevant evidence in the case record," including " the effects of treatment" and the

6

"limitations or restrictions imposed by the mechanics of treatment; e.g., frequency of treatment, duration, disruption to routine, side effects of medication." Looking at all the relevant evidence, the ALJ must consider the claimant's ability to meet the physical, mental, sensory and other demands of any job. 20 C.F.R. §§ 404.1545(a), 416.945(a) (2007). "This assessment of your remaining capacity for work is not a decision on whether you are disabled, but is used as the basis for determining the particular types of work you may be able to do despite your impairment(s)." Id. "In determining the claimant's residual functional capacity, the ALJ has a duty to establish, by competent medical evidence, the physical and mental activity that the claimant can perform in a work setting, after giving appropriate consideration to all of her impairments." Ostronski v. Chater, 94 F.3d 413, 418 (8th Cir. 1996).

Opinions on a claimant's Residual Functional Capacity are issues that are reserved to the Commissioner. The Regulations state that:

> We use medical sources, including your treating source, to provide evidence, including opinions, on the nature and severity of your impairment(s). Although we consider opinions from medical sources on issues such as whether your impairment(s) meets or equals the requirements of any impairment(s) in the Listing of Impairments in appendix 1 to subpart P of part 404 of this chapter, your residual functional capacity . . . or the application of vocational factors, the final responsibility for deciding these issues is reserved to the Commissioner.

See 20 C.F.R. § 416.927(e)(2) (2007).

> In determining what a claimant can do despite his limitations, the SSA must consider the entire record, including all relevant medical and nonmedical evidence, such as a claimant's own statement of what he or she is able or unable to do. That is, the SSA need not accept only physicians' opinions. In fact, if conflicting medical evidence is present, the SSA has the responsibility of resolving the conflict.

Diaz v. Chater, 55 F.3d 300, 306 (7th Cir. 1995) (citations omitted).

The Regulations state that opinions on these issues are not medical opinions as described in

the Regulation dealing with opinion evidence (20 C.F.R. §§ 404.1527(a)(2) and 416.927(a)(2));

rather, they are opinions on issues reserved to the Commissioner. 20 C.F.R. §§ 404.1527(e) and

416.927(e). For that reason, the Regulations make clear that "[w]e will not give any special

significance to the source of an opinion on issues reserved to the Commissioner. . . ." Id. §§

404.1527(e)(3) and 416.927(e)(3). The Regulations further provide that "[f]or cases at the

Administrative Law Judge hearing or Appeals Council level, the responsibility for deciding your

residual functional capacity rests with the Administrative Law Judge or Appeals Council." See 20

C.F.R. §§ 404.1545 and 416.946 (2007). However, the adjudicator must still apply the applicable

factors in 20 C.F.R. § 416.927(d) when evaluating the opinions of medical sources on issues

reserved to the Commissioner. See Social Securing Ruling ("SSR") 96-5p, 61 FR 34471, 34473

(1996).

Social Security Ruling 96-5p makes a distinction between an RFC assessment, which is "the

adjudicator's ultimate finding of 'what you can still do despite your limitations,'" and a "'medical

source statement,' which is a 'statement about what you can still do despite your impairment(s)'

made by an individual's medical source and based on that source's own medical findings." Id. SSR

96-5p states that "[a] medical source statement is evidence that is submitted to SSA by an

individual's medical source reflecting the source's opinion based on his or her own knowledge,

while an RFC assessment is the adjudicator's ultimate finding based on a consideration of this

opinion and all the other evidence in the case record about what an individual can do despite his or

her impairment(s)." Adjudicators "must weigh medical source statements under the rules set out in

20 C.F.R. § 416.927, providing appropriate explanations for accepting or rejecting such opinions."

Id. at 34474.

Every medical opinion received by the ALJ must be considered in accordance with the factors set forth in 20 C.F.R. §§ 404.1527(d) and 416.927(d) (2007). These factors include: (1) length of the treatment relationship and frequency of evaluation, (2) nature and extent of the treatment relationship, (3) supportability, (4) consistency, (5) specialization, and (6) various other factors. Additionally, the Regulations state that the Commissioner "will always give good reasons in our notice of determination or decision for the weight we give your treating source's opinion." Id. §§ 404.1527(d)(2) and 416.927(d)(2).

Under §§ 404.1527(d)(1) and 416.927(d)(1), more weight is given to an examiner than to a non-examiner. Sections 404.1527(d)(2) and 416.927(d)(2) provide that more weight will be given to treating sources than to examining sources (and, of course, than to non-examining sources). Sections 404.1527(d)(2)(I) and 416.927(d)(2)(I) state that the longer a treating source treats a claimant, the more weight the source's opinion will be given. Under §§ 404.1527(d)(2)(ii) and 416.927(d)(2)(ii), the more knowledge a treating source has about a claimant's impairment, the more weight will be given to the source's opinion. Sections 404.1527(d)(3), (4) and (5) and 416.927(d)(3), (4), and (5) add the factors of supportability (the more evidence, especially medical signs and laboratory findings, in support of an opinion, the more weight will be given), consistency (the more consistent an opinion is with the evidence as a whole, the more weight will be given), and specialization (more weight given to an opinion by a specialist about issues in his/her area of specialty). Unless the ALJ gives controlling weight to a treating source's opinion, the ALJ must explain in the decision the weight given to the opinions of state agency psychological consultants. 20 C.F.R. §§ 404.1527(f)(2)(ii) and 416.927(f)(2)(ii) (2007). The ALJ, however, is not bound by any findings made by state agency medical or psychological consultants and the ultimate determination

of disability is reserved to the ALJ. Id. §§ 404.1527(f)(2)(I) and 416.927(f)(2)(I).

In evaluating the opinions of treating sources, the Commissioner generally must give more weight to the opinion of a treating physician because the physician is often most able to provide "a detailed, longitudinal picture" of a claimant's alleged disability. See 20 C.F.R. §§ 404.1527(d)(2), 416.927(d)(2) (2007). Nevertheless, a treating physician's opinion is afforded "controlling weight only if two conditions are met: (1) that it is supported by clinical and laboratory diagnostic techniques and (2) that it is not inconsistent with other substantial evidence." Ward v. Chater, 924 F. Supp. 53, 55 (W.D. Va. 1996); see also, 20 C.F.R. §§ 404.1527(d)(2), 416.927(d)(2) (2007). The opinion of a treating physician must be weighed against the record as a whole when determining eligibility for benefits.  20 C.F.R. §§ 404.1527(d)(2), 416.927(d)(2) (2007). Ultimately, it is the responsibility of the Commissioner, not the court to review the case, make findings of fact, and resolve conflicts of evidence. Hays v. Sullivan, 907 F.2d 1453, 1456 (4th Cir. 1990). As noted above, however, the Court must not abdicate its duty to scrutinize the record as a whole to determine whether the Commissioner's conclusions are rational. Oppenheim v. Finch, 495 F.2d 396, 397 (4th Cir. 1974).

If the ALJ determines that a treating physician's opinion should not be afforded controlling weight, the ALJ must then analyze and weigh all the evidence of record, taking into account the factors listed in 20 C.F.R. §§ 404.1527 and 416.927(d)(2)-(6).

The evidence of record reveals that Claimant stopped working on March 8, 2003, after he fell from a fork lift and injured his back, neck, and left arm. (Tr. at 30-32.) Claimant began chiropractic treatment for complaints of low back pain on March 10, 2003, with Michael A. Blumfield, D.C. (Tr. at 9, 266.) On April 1, 2003, an MRI scan of Claimant's lumbar spine

10

demonstrated some discogenic edema in the anterior inferior endplate of T12 in keeping with early degenerative change. (Tr. at 304.) On June 2, 2003, Mr. Blumfield opined that Claimant's prognosis was "unfavorable for a complete recovery without residual symptoms." (Tr. at 266.) On September 4, 2003, Claimant underwent a consultative evaluation by Dr. A. E. Landis, M.D., for West Virginia Workers' Compensation purposes. (Tr. at 9-10, 261-64.) Claimant reported pain between his shoulder blades and down his lower back. (Tr. at 10, 262.) On examination, he exhibited decreased straight leg raising, some decreased range of lumbar spine motion, and mild tenderness to palpation of the lumbar spine. (Id.) He was able to heel and toe walk and had no motor weakness or muscle atrophy. (Tr. at 10, 262-63.) Dr. Landis opined that Claimant suffered a soft tissue injury to his lower back and recommended physical therapy in an aggressive exercise program for his lower back and non-steroidal anti-inflammatory medication. (Tr. at 10, 263-64.)

On May 17, 2004, Dr. Landis conducted a second consultative evaluation of Claimant. (Tr. at 10-11, 307-10.) Claimant reported that following the September, 2003, evaluation, he underwent physical therapy until two weeks ago, which made his symptoms worse. (Tr. at 10, 307.) Claimant reported low back pain with radiation into the upper back, which pain was continuous and increased with any activity. (Tr. at 10, 308.) On examination, Claimant had positive straight leg raising with low back pain, but intact sensation and no motor weakness, muscle atrophy, or muscle spasm. (Tr. at 10, 308.) Dr. Landis noted that his findings were consistent with symptom magnification. (Tr. at 10, 309.) He opined that Claimant had some mild degenerative disc disease at L5-S1 which could account for some of his back pain and "rather significant symptom magnification findings." (Tr. at 309.) Dr. Landis assessed a five percent whole man impairment related to his injury. (Tr. at 10-11, 309-10.)

11

Claimant was examined by Dr. D. Small, D.O., at the Robert C. Byrd Clinic on July 21, 2004, after having been seen by several physicians. (Tr. at 11, 429.) Claimant reported pain in the mid-thoracic and low back areas. (Id.) On exam, Dr. Small observed that Claimant stood hunched over almost in a hunchback position with his shoulders pulled up into his neck. (Id.) Dr. Small had Claimant relax his muscles and had him moving in a full range of motion. (Id.) On August 19, 2004, Dr. Small again noted that Claimant's shoulders were hunched up above his ears, but that as he talked to him, Claimant relaxed and his shoulders came down. (Tr. at 11, 428.) Dr. Small opined that most of Claimant's back pain was due to his anger regarding how he was being treated by his employer. (Id.)

An x-ray of Claimant's thoracic spine on June 13, 2005, revealed mild degenerative change, with minimally narrowed disc spaces in the lower thoracic spine at T10-11 and T11-12. (Tr. at 301.) An x-ray of Claimant's lumbar spine on July 9, 2005, following a lawn mowing accident demonstrated minor degenerative wedging of T12. (Tr. at 316.)

The medical record reflects Claimant's treatment with Dr. John O. Collins, M.D., from October 24, 2005, through June 11, 2007. (Tr. at 462-77.) The record further contains a Medical Assessment completed by Dr. Collins on November 2, 2006. (Tr. at 526-30.) On October 24, 2005, Claimant complained of back pain with radiation down his left leg and tingle pain in his left arm. (Tr. at 470.) Claimant suffered injuries to his back, neck, and left arm on March 8, 2003, at work when he fell ten feet from a pallet that was being lifted to a site. (Tr. at 30-32, 470.) Examination revealed no back tenderness to palpation and negative straight leg raising. (Tr. at 471.) Muscle strength was 4/5 in all muscle groups tested; sensation was normal to light touch, pinprick, and temperature; grip was decreased in the left and right hands; and fine motor movements were normal.

(Id.) Dr. Collins diagnosed cervicalgia, cervical degenerative joint disease, arm paresthesia, and low back pain. (Id.) He prescribed Naprosyn 500mg, Flexeril 10mg, trigger point injections for neck pain and spasms with occipital block on the left side, Ultram for breakthrough pain, and referred Claimant for physical therapy. (Tr. at 472.) Claimant underwent injections on October 24, November 18, and December 6, 2005. (Tr. at 467-69.)

On April 6, 2006, Claimant reported that he was doing well with a Duragesic patch, which he believed was "adequately controlling his symptoms." (Tr. at 474.) Nevertheless, he reported continued periods of stiffness in his neck and back with some increased symptoms when arising from sleep. (Id.) On examination, Claimant had mild tenderness in the left greater occiput, sternocleidomastoid, and splenius capitis. (Id.) He also had increased tone in the mid thoracic spine, but no midline tenderness. (Id.) He had normal strength, sensation, gait, and heel/toe walking. (Id.) Dr. Collins diagnosed cervical and thoracic degenerative joint disease, myofascial pain syndrome with a significant amount of spasms in the neck and back, and a history or arm paresthesias which had resolved. (Id.) Dr. Collins continued Claimant's physical therapy, having noted that it helped with his symptoms, resulting in less tenderness to palpation in the back, and did not cause any complications. (Tr. at 475.) Dr. Collins refilled Claimant's Fentanyl and noted that he would consider Claimant "for a BoTox in the neck given the degree of spasms and consideration of dystonic spasms." (Id.)

An MRI Scan of Claimant's cervical spine on April 27, 2006, revealed a large disc herniation with a left-sided component and significant bony portion at level C6-7, as well as left-sided cord flattening and left-sided neural foraminal encroachment. (Tr. at 476.) Neural surgical consultation was suggested. (Id.) A MRI Scan of Claimant's thoracic spine on the same date revealed posterior

element hypertrophy that appeared primarily to be bony and then right-sided with thecal sac effacement at the level of T9-10. (Tr. at 476-77.)

Claimant returned to Dr. Collins on May 23, 2006, complaining that any kind of jerking movements, such as riding on a four-wheeler, increased the pain in his neck, which produced severe neck stiffness. (Tr. at 473.) Dr. Collins diagnosed neck pain; myofascial pains/spasms, and cervical degenerative joint disease/spondylopathy. (Id.) He continued to prescribe a Duragesic patch at 50mcb per hour. (Id.)

On September 15, 2006, Dr. Collins completed a Routine Abstract Form - Physical, based on his physical findings as of October 24, 2005. (Tr. at 462-66.) Dr. Collins described Claimant's musculoskeletal system as abnormal, with a hunched posture, a slightly decreased wrist flexion at 4/5 bilaterally, decreased range of finger and wrist motion, weakness in the lower extremities, muscle atrophy in all extremities, decreased reflexes in the upper extremities, and decreased motor strength. (Tr. 463-64.) He reported Claimant's medications to include Duragesic Patches, Prevacid, Flexeril, and Lortab. (Tr. at 465.) His diagnoses included cervicalgia; thoracic/cervical degenerative joint disease/spondylopathy; low back pain; myofascial pain syndrome with spasms; arm paresthesia; and neck pain. (Id.)

On September 19, 2006, Claimant reported that he was fine with the exception of a little breakthrough pain, depending on the weather. (Tr. at 568.) Claimant reported continued neck pain with intermittent episodes of numbness in his fingers and arms. (Id.) He also had numbness in his left forearm, arm, and left torso. (Id.) Physical exam revealed a decreased range of motion in the neck, decreased sensation to pinprick in the C7-8 dermatomes of the left arm, and 4/5 strength in the left biceps, brachioradialis, wrist exterior, and wrist flexors. (Id.) Dr. Collins diagnosed cervical

degenerative joint disease with C6-7 disc herniation, cervical radiculopathy at C7-T1, neck pain, and cervical muscle spasms. (Id.) He noted that Claimant was "still with a great deal of pain and stiffness" but had good responses to prior cervical steroidal injections, which he repeated pending neurosurgical intervention. (Id.)

Dr. Collins completed a form Medical Assessment of Ability to Do Work-Related Activities (Physical) on November 2, 2006. (Tr. at 527-30.) Dr. Collins opined that due to Claimant's large cervical disc herniation at C6-7 with spinal cord impingement, as well as neuroforaminal encroachment causing nerve root compression and spinal cord compression, he was limited to lifting and carrying only five pounds; walking, sitting, or standing one or two hours per day; never climbing, balancing, stooping, or crawling; and occasionally kneeling. (Tr. at 527-28.) He further opined that Claimant's ability to reach, handle, feel, push, and pull were affected by his impairments. (Tr. at 529.) Dr. Collins stated that Claimant was at "risk for spinal cord compression for any kind of physical activity especially that involves the [upper extremities] & neck. Cannot recommend any work [and] activity until his neck situation can be addressed by neurosurgeon [and] surgically corrected." (Tr. at 530.)

Claimant returned to Dr. Collins for a follow-up examination on January 29, 2007, at which time he reported that his house had been broken into and all his medications and the Duragesic were stolen. (Tr. at 567.) Dr. Collins noted that Claimant had rescheduled physical therapy with surgery, though he did not want it, but welcomed it if it would help with his pain. (Id.) Dr. Collins continued his medications, with the plan to avoid dosage escalation pending surgery. (Id.) He noted that Claimant remained functional but had problems with neck stiffness. (Id.) On March 13, 2007, Claimant reported that he had been doing well with continued pain as before, but no problems with

gait and balance. (Tr. at 565.) He had a recent cold with sneezing and coughing, which increased his neck pain. (Id.) Physical exam revealed markedly decreased range of neck motion in all planes. (Id.) Dr. Collins diagnosed cervical degenerative joint disease with spondylopathy, cervical disc herniation, and cervical muscle spasms. (Id.) Claimant returned on April 24, 2007, for a follow-up examination, but left before examined by Dr. Collins. (Tr. at 560-61.)

On May 10, 2007, Claimant reported neck and some thoracic area pain with radiation into the left arm and down the left paraspinals and down the back of his left leg. (Tr. at 572-73.) Claimant described the pain as burning, numbness, and stabbing in nature, and rated the pain at a level six out of ten in severity. (Id.) Claimant denied any focal weakness, numbness, or tingling. (Tr. at 572.) Dr. Collins noted no overall change in severity of his pain symptoms. (Id.) Dr. Collins diagnosed chronic neck pain, cervical degenerative joint disease with spondylopathy, cervical muscle spasms, thoracic muscle spasms, and suspected cervical radiculopathy at the C7-T1 area. (Id.) He stated that Claimant was "currently with manageable pain." (Id.) Dr. Collins therefore, continued Claimant's medications and advised him to exercise as tolerated. (Tr. at 572, 574.) A MRI scan of Claimant's thoracic spine on June 4, 2007, demonstrated minor degenerative wedging of the bodies of T6-10 and no evidence of any disc bulging or herniation. (Tr. at 576.)

In addition to Dr. Collins's treatment, the medical evidence reveals that on August 30, 2006, Dr. John A. Jane, Sr., M.D., Ph.D., chief neurosurgeon at the University of Virginia Health System ("UVA"), examined Claimant regarding his complaints of pain in his neck, left arm, and left leg, that he alleged resulted from a forklift accident in March, 2003. (Tr. at 20, 483.) On examination, Dr. Jane noted that Claimant made "a rather peculiar impression, as if he were heavily sedated with drugs." (Tr. at 20-21, 483.) He noted that Claimant's entire left arm was weak, "all of which is effort

dependent," but that he was unable to localize its specific deficit. (Tr. at 21, 483.) Dr. Jane further

noted a definite C6-7 disc on the left. (Id.) Dr. Jane opined that Claimant's pain "is probably real,

but [he] is unable to communicate exactly what is going on." (Id.) He ordered a CT myelogram and

EMG for objective evidence and recommended consideration of surgical decompression. (Id.)

On September 26, 2006, Serafino S. Maducdoc, Jr., M.D., conducted a consultative

examination of Claimant at the request of the state agency Disability Determination Service. (Tr.

at  21, 503-11.) Claimant reported that in March, 2003, while welding on a cliff, he suddenly

dropped ten to twelve feet, flipped over, transferring all his weight to his legs, and sustaining pain

in his neck and mid-back. (Tr. at 21, 503.) Claimant also reported occasional generalized weakness,

headaches, dizziness, numbness off and on in the left upper and lower extremities, as well as pain

that shot up to his head and through his entire spine. (Tr. at 21, 503-04.) He rated his pain at a level

seven to eight out of ten, and reported that at times, the pain exceeded level ten. (Tr. at 21, 503.) On

physical examination, straight leg raising was 90 degrees bilaterally, lower extremity muscle

strength was 4/4 on the right side and 3/4 on the left side with good effort. (Tr. at 21, 505.) Deep

tendon reflexes were 2+ bilaterally, sensation was intact, and he was able to walk on his heels and

toes, but with difficulty. (Id.)  Claimant had clubbed fingers, which was a familial characteristic.

(Id.) He was able to extend his hands fully, and had full range of motion of his elbows, shoulders,

wrists, and knees. (Id.) Grip strength of his upper extremities was 4/5 on the left and 5/5 on the right.

(Id.) Dr. Maducdoc observed no muscle atrophy. (Id.) Dr. Maducdoc's diagnostic impressions

included chronic cervical and thoracic spine strain and  possible herniated nucleus pulposus with

radiculopathy and sciatica. (Tr. at 21, 506.) He opined that Claimant's prognosis was fair. (Id.)

On October 5, 2006, Dr. Marcel Lambrechts, M.D., a state agency physician, completed a

form Physical Residual Functional Capacity Assessment, on which he opined that Claimant was capable of performing light exertional level work, with limited use of the upper extremities for pushing and pulling. (Tr. at 513-20.) He further opined that Claimant should never climb ladders, ropes, or scaffolds or balance, and could occasionally climb ramps or stairs, stoop, kneel, crouch, or crawl. (Tr. at 515.) Dr. Lambrechts opined that due to Claimant's neck pain and a herniated disc at C6-7, which was a moderate impairment, he was limited in reaching all directions and feeling. (Tr. at 516.) He further opined that Claimant should avoid concentrated exposure to extreme heat or cold and vibration, and even moderate exposure to hazards. (Tr. at 517.) Dr. Lambrechts noted that Claimant had a large herniated disc at the C6-7 level and spinal stenosis, which accounted for his occasional numbness. (Tr. at 518.)

Claimant was examined by Julie Hanna, physician assistant at Seneca Health Services on October 9, 2006. (Tr. at 524-25.) Claimant reported that he was doing well and that his pain had decreased with use of the Fentanyl patch. (Tr. at 524.) Ms. Hanna observed that Claimant was able to ambulate without a cane and apparently, without pain. (Id.) Diagnoses included pain disorder with physical and psychological features and alcohol abuse in full sustained remission. (Id.) He was continued on Valium, which provided good benefit for anxiety and possible relief for muscle spasms. (Id.) On January 8, 2007, Claimant reported that the Valium helped him remain calm. (Tr. at 15, 522.) Ms. Hanna noted that Claimant continued to walk somewhat bent over due to pain and that the Valium helped with his muscle spasms. (Id.)

On December 27, 2006, Dr. James Binder, M.D., a state agency physician, completed a form Physical Residual Functional Capacity Assessment, on which he opined that Claimant was capable of performing light exertional level work. (Tr. at 537-44.) He opined that Claimant's ability to push

18

and pull was limited in the upper extremities due to left arm weakness secondary to impingement. (Tr. at 538.) Dr. Binder further opined that Claimant should never climb ladders, ropes, or scaffolds or climb, and could occasionally climb ramps or stairs, stoop, kneel, crouch, or crawl. (Tr. at 539.) He found that Claimant's ability to reach in all directions and to feel was limited, that he should avoid concentrated exposure to extreme cold and vibration, and that he should avoid even moderate exposure to hazards. (Tr. at 540-41.)

The ALJ found that Claimant had a spinal disc disorder and sprains/strains of all types, which were severe impairments. (Tr. at 15.) Having determined that Claimant's impairments did not meet or equal a listed impairment, the ALJ conducted a pain and credibility analysis stating as follows:

> The undersigned finds that the claimant's allegations regarding the severity, chronicity and debilitating nature of the extent of his limitations, his subjective complaints of pain and other symptoms, and his inabilities to work, perform functional activities, activities of daily living and work-related activities are not credible as established in the record. Several doctors have noted the claimant's unusual presentation: Dr. Landis in May 2004 noted that he demonstrated symptoms magnification and pain behavior throughout the examination versus very low pain tolerance level. (Exhibit B-3F). In September 2003, Dr. Landis noted that the claimant[] had subjective complaints of low back pain but that his straight leg raising test was 180 degrees of knee extension and 100 degrees of hip flexion in the sitting position causing back pain that was non-physiologic. He also noted that the claimant was somewhat "spaced out" and that his general demeanor did not appear to be normal but that he did not know if the claimant was on drugs. (Exhibit B-2F and B-4F). Dr. Small in July 2004 noted that the claimant had a hunched up posture but relaxed during the conversation, that he could return to work, and that he had a lot of anger regarding how he was treated by his employer. She also noted that he was "well-muscled" in spite of his complaints of chronic pain. (Exhibit B-5F). Dr. John Jane in August 2006 noted that the claimant acted as if he were heavily sedated with drugs, although he reported that he was only treated with a Fentanyl patch but Dr. Jane was unable to localize the complaints of pain in his entire left arm to a specific deficit. (Exhibit B-10F). Dr. Eitel, his treating psychiatrist, diagnosed the claimant with a pain disorder with physical and psychological features. (Exhibit B-6F). The claimant reported to Dr. Eitel in July 2006 that he felt "like he was a new man with his medication and [was] less frustrated." (Exhibit B-6F). During the summer of

2005, the claimant made several visits to the emergency room; he was referred to a pain clinic for medical treatment for pain and advised to not return to the emergency room for chronic back pain. (Exhibit B-2F). Also during that period, his treating primary care physician, Dr. Hyler-Both advised that he would not write for chronic pain medications so the claimant appeared at his next visit in a wheelchair and was wheeled in by his brother. Dr. Hyler-Both referred him to a pain clinic. (Exhibit B-7F). The Administrative Law Judge concludes that the claimant's complaints of pain are exaggerated and that, although he may have some pain and other symptomatology, they are not totally debilitating because he shops, performs at least some household chores, helps care for two children, ages 5 months old and 5 years old, visits, watches television and movies, and drives. His complaints are inconsistent with his doctors' records, with objective laboratory studies, and with his physicians' notes regarding his reports to his treating physicians. Although his alleged limitations may cause him to perform tasks more slowly, he is able to perform work with appropriate treatment in an appropriate work setting.

The claimant has more complaints of pain and other symptoms than he has pain and other symptoms. He needs to become motivated to care for himself and become self-supporting and a responsible citizen. As detailed above, his testimony regarding the severity, chronicity, and debility of his back, leg, and arm pain and other symptomatology, diagnoses, and treatment is exaggerated, is not credible, and undercuts his credibility with respect to the extent of his functional limitations.

(Tr. at 18-19.) The ALJ proceeded to determine Claimant's RFC on the basis of the record, including

the opinions of the two state agency opinions, Drs. Lambrechts and Binder, as follows:

Finally, as for the opinion evidence, in reaching this conclusion, the medical opinions of the State agency medical consultants at the initial and reconsideration levels regarding the claimant's abilities to do work-related activities are adopted. (Exhibits 16F and 22F). These opinions are well-supported by medically acceptable clinical and laboratory diagnostic techniques and are not inconsistent with the other substantial evidence in the record. Although the State agency medical consultants did not examine the claimant, they provided specific reasons for their opinions about the claimant's residual functional capacity showing that they are grounded in the evidence in the case record, including careful consideration of the claimant's allegations about her symptoms and limitations. Evidence which was received into the record after the reconsideration determination did not provide any new material information that would alter any findings about the claimant's residual functional capacity. (20 CFR 404.1527(d), and (f); Social Security Rulings 96-2p and 96-8p).

(Tr. at 19.)

Having considered the applicable legal standards and thoroughly examined the record, the

20

undersigned finds that the ALJ's RFC assessment is not supported by substantial evidence because

he failed to consider the November 2, 2006, opinion of Claimant's treating physician, Dr. Collins.

Consequently, the ALJ did not assign any weight to Dr. Collins's opinion. The ALJ must accompany

his decision with sufficient explanation to allow a reviewing court to determine whether the

Commissioner's decision is supported by substantial evidence.  "[T]he [Commissioner] is required

by both the Social Security Act, 42 U.S.C. § 405(b), and the Administrative Procedure Act, 5 U.S.C.

§ 557(c), to include in the text of [his] decision a statement of the reasons for that decision."  Cook

v. Heckler, 783 F.2d 1168, 1172 (4th Cir. 1986).  The ALJ's "decision[] should refer specifically

to the evidence informing the ALJ's conclusion.  This duty of explanation is always an important

aspect of the administrative charge . . . ."  Hammond v. Heckler, 765 F.2d 424, 426 (4th Cir. 1985).

The United States Court of Appeals for the Fourth Circuit has stated that in Social Security

cases, "[w]e cannot determine if findings are unsupported by substantial evidence unless the

Secretary explicitly indicates the weight given to *all* of the relevant evidence." Gordon v. Schweiker,

725 F.2d 231, 235 (4th Cir. 1984) (emphasis added). Quoting its decision in a prior case, the Court

stated as follows:

> The courts . . . face a difficult task in applying the substantial evidence test when the
> Secretary has not considered all relevant evidence.  Unless the Secretary has
> analyzed all evidence and has sufficiently explained the weight he has given to
> obviously probative exhibits, to say that his decision is supported by substantial
> evidence approaches an abdication of the court's 'duty to scrutinize the record as a
> whole to determine whether the conclusions reached are rational.'

Id. at 236 (quoting Arnold v. Secretary, 567 F.2d 258, 259 (4th Cir. 1977)).

The Court finds that the ALJ failed to mention or consider Dr. Collins's opinion, and

consequently, failed to explain the weight given to all of the relevant evidence. The ALJ's statement

that "[e]vidence which was received into the record after the reconsideration determination did not

provide any new material information that would alter any findings about the claimant's residual functional capacity," is not sufficient. It is unclear whether the ALJ considered Dr. Collins's November 2, 2006, opinion, or if he did, what weight he gave it. Accordingly, the Court finds that the ALJ's failure to address the opinion of Claimant's treating physician, at a minimum, warrants remand for further proceedings consistent with this Memorandum Opinion.

After a careful consideration of the evidence of record, the Court finds that the Commissioner's decision is not supported by substantial evidence. Accordingly, by Judgment Order entered this day, the Plaintiff's Motion for Judgment on the Pleadings (Document No. 19.) is **GRANTED**, Defendant's Motion for Judgment on the Pleadings (Document No. 23.) is **DENIED**, the final decision of the Commissioner is **VACATED**, and this matter is **REMANDED** to the Commissioner pursuant to sentence four of 42 U.S.C. § 405(g) for further administrative proceedings.

The Clerk of this Court is directed to send a copy of this Memorandum Opinion to counsel of record.

ENTER: November 19, 2009.

R. Clarke VanDervort
United States Magistrate Judge

22